UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| In re: | § § | |
| SILICON HILLS CAMPUS, LLC | § § | Case No. 20-10042-tmd |
|     Debtor. | § | |

| | | |
|---|---|---|
| SILICON HILLS CAMPUS, LLC | § § | |
|     Plaintiff | § § | |
| v. | § § | Adversary No. _____ |
| TUEBOR REIT SUB, LLC | § § § | |
|     Defendant | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE TONY DAVIS, UNITED STATES BANKRUPTCY JUDGE:

Silicon Hills Campus, LLC files this Complaint against Tuebor REIT Sub, LLC, as follows:

### PARTIES

1. Plaintiff Silicon Hills Campus, LLC ("Plaintiff" or "Silicon Hills") is a Delaware limited liability company and is the Debtor-in-Possession in the underlying bankruptcy case.

2. Plaintiff/Counterclaim Defendant Tuebor REIT Sub, LLC ("Defendant" or "Lender") is a limited liability company organized and existing under the laws of Michigan, whose agent for service is Scott Geromette, 2290 First National Building, 660 Woodward Ave., Detroit, MI 48226.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §1334. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2).

4. Venue is proper in this Court because it is the court where Silicon Hills' bankruptcy case is pending.

## FACTUAL BACKGROUND

5. On or about February 6, 2018, Silicon Hills executed a Promissory Note in the original amount of $64,000,000.00 in favor of Ladder Capital Finance, LLC ("Original Lender"). The Loan is secured by, among other collateral, a 158 plus acre property containing 1.3 million square feet of improvements and an attendant power plant (the "Property").

6. Allegedly, the Original Lender subsequently transferred all of its right, title and interest in the Loan and loan documents to Tuebor REIT Sub LLC as the Lender.

7. Pursuant to the Loan Agreement, the Loan was to mature May 6, 2019 (the "Original Maturity Date").

8. Prior to the Original Maturity Date, Lender and Silicon Hills entered into the First Amendment to Loan Agreement, Guaranty of Recourse Obligations, and Other Loan Documents ("First Amendment"), dated May 4, 2019. Pursuant to the First Amendment, the maturity of the Loan was extended to July 17, 2019 ("First Extended Maturity Date").

9. Prior to the First Amendment, the Parties negotiated and exchanged correspondence and reached an agreement as to the terms, including payment required from Silicon Hills, to execute the First Amendment.

10. Thereafter, prior to the First Extended Maturity Date, Lender and Silicon Hills entered into the Second Amendment to Loan Agreement and Other Loan Documents ("Second

Amendment"), dated July 15, 2019. Once again, the parties had previously negotiated and agreed on terms for the Second Amendment. Pursuant to the Second Amendment, the maturity date was once again extended to August 16, 2019 ("Second Extended Maturity Date").

11. Per the Second Amendment, the maturity date was initially extended to August 16, 2019. Additionally, the Second Amendment contained an option for Silicon Hills to further extend the maturity date to August 30, 2019, provided that Silicon Hills perform certain conditions, including making a payment of approximately $505,000.00 prior to August 15, 2019. Per the Second Amendment, extending the maturity date to August 16, 2019 also required Silicon Hills to make payments totaling in excess of $1,655,000.00. The Parties had fully negotiated all of the terms of the Second Amendment prior to its execution.

12. Prior to the August 30, 2019 extended maturity date, the parties once again began negotiation for an extension from August 30, 2019 to December 30, 2019. During these negotiations, the parties exchanged various terms and requirements which resulted, as far as Silicon Hills was concerned, an agreement that Silicon Hills would be required to meet certain requirements prior to August 30, 2019, and conditioned on performing these requirements, Lender agreed to an extension until December 2019.

13. On or about August 21, 2019, Lender and Silicon Hills began discussion of the extension terms to extend the maturity date of the Note from August 30, 2019 to December 2019.

14. On August 22, 2019, Robert Perelman ("Perelman") sent an e-mail on behalf of the Lender to Silicon Hills setting forth eighteen specific terms that would need to be agreed to and accomplished prior to August 30, 2019. These included, without limitation, (i) a payment of $500,000.00 "good faith" deposit by Silicon Hills with the Lender; (ii) Silicon Hill's payment of a $1,000,000.00 principal pay-down plus a $10,000.00 exit fee; (iii) Silicon Hills' payment of

4831-3620-7033.1

3

$151,250.00 as an extension fee; (iv) Silicon Hills' payment of $716,667.00 for real estate taxes; (v) Silicon Hills' payment of $1,387,824.00 for debt service; (vi) evidence of insurance coverage and fully paid premiums for twelve months; and (vii) and amount to be determined for common area maintenance ("CAM") which included third-party property manager fees, power plant expenses/payroll, property security and insurance (the "Term Sheet").

15. Plaintiff detrimentally relied upon Lender's representation that it would execute a Third Amendment and modify the Loan based on the Term Sheet, which including a "funding sheet" with amounts acceptable to Plaintiff to close on the Third Amendment, by not actively seeking financing from an alternate Lender to pay off the Loan on or before August 31, 2019.

16. On August 23, 2019, Perelman sent Silicon Hills an e-mail requesting the $500,000.00 "good faith" deposit be provided pursuant to the accompanying wire instructions. Perelman also stated a draft agreement had been prepared and would be sent for Silicon Hills' review and comment.

17. On August 27, 2019, Silicon Hills sent Lender an e-mail with attached agreements for the operations and management of the Property and power plant. This e-mail also set out Silicon Hills' plan with respect to the power plant transition; escrow and operating expenses by Silicon Hills; copy of a proposed insurance policy; and information related to basic property management.

18. On August 29, 2019 at 3:51 p.m., Lender sent Silicon Hills an e-mail stating that the $500,000.00 "good faith" deposit had been received and provided an attached "funding sheet" which set forth all of the remaining amounts of money Silicon Hills had to provide to Lender to secure extension of the Loan. The "funding sheet" set forth that Silicon Hills would be required to send Lender $2,592,954.00 for various purposes, including loan pay-down, taxes, debt service,

and extension fee, among other items. Silicon Hills conceded to these terms and was prepared to fully fund this requirement.

19. On August 29, 2019 at 7:10 p.m., Lender's counsel sent Silicon Hills a revised copy of the Third Amendment and an updated version of the "funding statement." This funding statement, received less than 18 hours prior to the Loan expiration, was dramatically different than what the parties had previously agreed to. Instead of requiring the payment of approximately $2.5 million dollars, Lender now demanded payment for $3,217,153.00. Lender provided no rationale or bases, other than an arbitrary increase in the Lender's estimate of CMA.

20. On August 29, 2019 at 9:48 p.m., Lender sent Silicon Hills an acknowledgement that it had submitted its signatures agreeing to the extension to be held in escrow.

21. On August 30, 2019 at 5:55 a.m., Lender sent to Silicon Hills an e-mail acknowledging its receipt of the fully executed extension documents by Silicon Hills. However, the Lender once again demanded the payment of $3,217,153.00, rather than the previously agreed upon amount of approximately $2.5 million.

22. On August 30, 2019 at 8:55 a.m., Silicon Hills informed Lender that it had expected to have small edits to the escrow requirement numbers submitted shortly. At 9:28 a.m., Silicon Hills submitted to Lender a revised version of the "funding statement" disputing several of the amended figures and offering to pay $2,527,739.00, a number substantially similar to that previously agreed to by the Parties.

23. Lender refused to honor the prior agreement, refused to recognize the loan extension, and demanded full and final payment as if the Loan had matured on August 30, 2019. Additionally, Lender has retained the $500,000 "good faith" deposit and provided no accounting of its application.

24. As with negotiation of the First Extended Maturity, Lender and Silicon Hills negotiated and exchanged correspondence, and reached agreements as to the terms prior to the maturity date, including any payments required from Silicon Hills. Silicon Hills relied upon the agreements reached, and there were no unilateral alterations prior to executing the documents. The same pattern occurred in negotiating and agreeing to the Second Amendment extending the maturity date. Thus, on August 29, 2019, at 3:51 p.m., when Silicon Hills received an email and "funding sheet" from the Plaintiff stating a required payment of $2,592,954.00, Silicon Hills believed at that time, and still does, that it had reached an agreement on the amount required, just as it had done in the first amendment and second amendment.

25. On August 29, 2019, the Lender and Silicon Hills had a fully binding agreement to extend the loan maturity to December 2019, which Lender refused to honor.

26. Based on Lender's refusal to honor the agreement reached by the parties, Lender erroneously claimed the Loan to be in maturity default as of 1:00 p.m. August 30, 2019 and abruptly discontinued and refused all communication with Silicon Hills while Lender marched to the courthouse with a pre-prepared *ex parte* Emergency Application for the Appointment of a Receiver over the Property and sought to place the property in receivership. An emergency hearing was held, and Lender's application to appoint a Receiver was denied.

27. Lender, ignoring the agreement to extend the Loan maturity date, posted the Property for a non-judicial foreclosure for October 1, 2019.

28. Silicon Hills sought a Temporary Restraining Order in Travis County, Texas (the ("State Court") to set aside the October foreclose citing the events indicated above, including the fact that the parties had reached an enforceable agreement to extend the maturity date of the Loan to December 2019.

29. On September 30, 2019, a hearing was held, and the State Court agreed with Silicon Hills and entered the Temporary Restraining Order indicating in its Order, "the Court finds there is a reasonable likelihood that Silicon Hills will prevail on its claim and causes of action".

30. During the same hearing the State Court approved the imposition of a Receiver over the collateral Property and the parties negotiated the terms and parameters of the receivership and thereafter, on October 18, 2019, the State Court entered an order appointing a Receiver ("Order Appointing Receiver") setting forth the duties and obligations of the Lender and Receiver with respect to operating the Property.

31. Among other things, the Order Appointing Receiver expressly required that the power plant on the Property be maintained in status quo continuous operations and continue the "in-place plan to operate and resume power generation."

32. In response to the State Court's Order to continue the in-place plan, the Receiver entered into an agreement, dated October 25, 2019, with the existing plant operator ("Ameresco") to continue the in-place plan to operate the power plant under which the Receiver agreed to pay the fees and expenses for the operation of the power plant, and Lender was required to provide "funds sufficient to cover" all outstanding and ongoing charges (the "Ameresco Agreement").

33. The Ameresco Agreement was presented to the State Court, and under these terms, Silicon Hills did not object and the Court entered an Order approving the same on October 29, 2019 (the "Order Approving Engagement of Power Plant Operator").

34. In addition to Lender's clear obligation to fund the receivership pursuant to the Order Approving Engagement of Power Plant Operator, the Order Appointing Receiver also required Lender to continue to fund the operations unless "*Lender first notifies the Receiver and Defendant at least thirty days prior to the cessation of funding.*" To protect Lender, the Order

Appointing Receiver also permitted the Lender to seek a Court order deeming any such advances made by Lender to be part of Brower's indebtedness.

35. Lender sought the State Court's authorization to advance funds under the Receivership three times. On October 25, 2019, the State Court entered an Order Authorizing Lender to Advance Funds to Secured Indebtedness approving $170,650.00 for certain outstanding utilities invoices and approved adding this amount to Borrower's debt ("First Payment Order"). On November 19, 2019, Lender sought and received an Agreed Order Authorizing Lender to Advance Funds to Secured Indebtedness approving $24,743.50 for certain utilities invoices and $93,307.73 for Ameresco, and approved adding these amounts to Borrower's debt ("Second Payment Order"). On November 21, 2019, Lender sought and received a third Agreed Order Authorizing Lender to Advance Funds to Secured Indebtedness approving $34,405.80 for insurance, and $33,669.37 for Ameresco, and approved adding these amounts to Borrower's debt ("Third Payment Order" and together with the First Payment Order and Second Payment Order, the "Payment Orders").

36. On December 17, 2019, for the first time, Lender admitted that despite representations to the Court that the amounts under the Payment Orders would be timely paid, the payments were surreptitiously withheld and not paid. The Lender eventually admitted: "*Those [Ameresco] funds have not been advanced [by Lender] based on Ameresco's unwillingness to provide more cost-effective terms for the operation of the Central Utility Plant.*" Lender's purposeful withholding of payments to the third-party operator of the power plant caused Debtor's vendor to curtail its services and eventually terminate its contract on short notice in December 2019. A replacement vendor, selected by Receiver, was put in place to temporarily maintain basic operations. The new vendor indicated that the power plant was in "fair to poor" condition. This

deterioration of condition was a direct result of Lender's bad-faith refusal to fund Ameresco, after representing that it would do so and failure to notify Receiver, Silicon Hills or the State Court of its intention to cease funding, as required by the Order Appointing Receiver.

37. Lender's deliberate defiance of Court Orders to fund the receivership and ensure continuous operation of the power plant created an emergency situation at the Property whereby there was not a plant operator in place shortly before a scheduled foreclosure sale of the Property. Lender's actions have harmed the Debtor and caused Debtor to file its bankruptcy case, incurring substantial costs in connection with the bankruptcy, and additional substantial amounts to correct and cure deterioration at the Property due to the inaction by the Lender and the Receiver. Moreover, Lender's authorization to proceed with a foreclosure sale of the Property on January 7, 2019 was obtained, in part, through failure to advance funds required under the state court's order, which such failure was purposely designed to construct an emergency situation at the Property that would not have existed had Lender made payment of the Ameresco fees in accordance with its own representations and requirements under court orders.

38. Additionally, approximately $1,050,559.76 in Silicon Hills cash was being held by Lender in reserve to fund operations and development costs for the Property ("***Excess Cash Reserve***"). The Excess Cash Reserve was funded on a monthly basis by Debtor from rental receipts through the term of the Loan. Lender failed to authorize payment of amounts properly payable for operations and development costs, including but not limited to an amount owing to M. Arthur Gensler Jr. & Associates, Inc. ("Gensler") for the preparation of Master Site Planning and Concept Design Studies. Gensler subsequently filed a mechanic's lien, which Lender now contends was an event of default. Upon information and belief, Lender has drawn these funds and used them to

pay amounts it asserts are due from Plaintiff, and has failed to provide any accounting of the use of these funds.

39. Upon information and belief, Lender intentionally refused to authorize payment of certain vendors from the Excess Cash Reserve in the hope and expectation that those vendors would file a mechanic's lien against the Property, which Defendant could then cite as a default under the terms of the Loan. Indeed, it eventually became clear that Lender was not allowing the payment of any vendors or mechanics from the Excess Cash Reserve, and it would have been futile for Plaintiff to make any further requests, including any request to have Gensler paid in order to remove the mechanic's lien. Accordingly, the filing and maintenance of any such mechanic's liens against the Property should not constitute a default under the Loan attributable to Plaintiff or trigger any remedies under the Loan Documents.

40. Defendant's actions as described in paragraphs 37-39 above were done in bad faith.

41. All conditions precedent to Silicon Hills' recovery on the claims asserted herein have occurred.

## CAUSES OF ACTION

### Declaratory Judgment

42. Silicon Hills incorporates by reference the factual allegations contained in the preceding paragraphs.

43. A controversy has developed between the parties regarding the Loan Agreement. Specifically, the Lender claims that Silicon Hills was in maturity default as of August 30, 2019 for failure to pay the outstanding balance of the Note. Silicon Hills denies that this event has occurred as Lender describes and asserts Lender and Silicon Hills reached an enforceable agreement to extend the maturity date of the Loan. As a result, Borrower contends that it is not in default of the

Loan Agreement and Lender did not have the right to seek to foreclose. Further, Lender has not demonstrated that it is a proper holder of the Note and that the purported transfer of the Loan was a valid conveyance and therefore Borrower demands that such a showing be made before Lender be permitted to enforce any of "lender's" rights under the Loan. As noted above, Lender also claims that the mechanic's lien placed on the Property by Gensler, which was caused by Lender's failure to fund, was an event of default. Based upon Defendant's bad faith and unclean hands, and Plaintiff's detrimental reliance upon the misrepresentations of Lender regarding the Term Sheet for the Third Amendment, Defendant and Lender should be equitably estopped from declaring a default under the Loan Agreement, foreclosing or appointing a receiver over the Property or exercising any other rights or remedies under the Loan Documents based upon the purported maturity default as of August 30, 2019 or any default based upon the mechanic's lien. Accordingly, Silicon Hills seeks the Court's intervention to determine the rights, duties and obligations of the parties pursuant to Tex. Civ. Prac. Rem. Code §37.001, *et seq*. and/or the Federal Declaratory Judgment Act, 28 U.S.C. §2201, and/or other applicable law.

## Breach of Contract

44. Plaintiff incorporates by reference the factual allegations contained in the preceding paragraphs.

45. The Third Amendment to Loan Agreement is a valid and enforceable contract between Silicon Hills and Lender. Silicon Hills performed, tendered performance of, or was excused from performing its contractual obligations under the contract, and is the proper party to sue for breach of the Agreement.

46. Silicon Hills was not in default of the Loan, and is not in default of the Loan, on the basis of a maturity default purported to occur on August 30, 2019, or any other purported basis

for default that Defendant may propound. Nonetheless, Lender continues to seek to improperly impose a receivership on Silicon Hill's Property, charge default interest on the Loan as of the date of the alleged default, and without authority, foreclose on the Property.

47. Plaintiff's August 29, 2019 communication, and Lender's retention of the $500,000.00 "good faith" deposit for the loan modification, and Lender's confirmation that it had executed the Third Amendment to the Loan, were unequivocally referable to parties' agreement to modify the Loan on the terms previously agreed to between the parties in the Third Amendment, which included the "funding sheet" amounts sent by Lender to Plaintiff on August 22, 2019.

48. Lender's wrongful declaration of default, imposition of a Receiver, charging of default interest, and seeking an improper foreclosure are breaches of Lender's obligations under the Loan Agreement for which Plaintiff has suffered and continues to suffer damages, which are within the jurisdictional limits of this Court.

49. Additionally and alternatively, Lender's actions are in breach of the covenant of good faith and fair dealing imposed pursuant to applicable law.

**Fraud**

50. Plaintiff incorporates by reference the factual allegations contained in the preceding paragraphs.

51. By sending an erroneous default notice when Silicon Hills was not in default of the Loan Agreement as extended, Lender made a material representation that was false. Having no basis for determining that a fully negotiated third extension of maturity date had not occurred, Lender knew the representation was false at the time it sent the notice, or Lender recklessly asserted the representation of default without knowledge of its truth.

52. Knowing that Silicon Hills would have difficulty securing new financing for the Property if Silicon Hills was accused of being in default of a loan agreement, the Property was in receivership and the Property was facing foreclosure, Lender pursued the wrongful default in order to manufacture a profitable and premature exit from its position as owner of the Loan.

53. Lender intended to induce Silicon Hills to act upon the fraudulent representation. Silicon Hills actually and justifiably acted upon the representation and thereby suffered injury.

54. Further, by representing to the Court, to the Receiver and to Silicon Hills, that Lender would timely make payments to fund the continuous operation of the power plant on the Property, Lender made material representations that were false. Having no actual intention to make the payments as represented, Lender knew the representations were false at the time it made them.

55. Knowing that the Property would suffer a diminution in value if the power plant was not continuously operated, Lender intentionally withheld its promised payments to fund the operation of the power plant in order to manufacture a situation where the property would be devalued at foreclosure and would drive away potential bidders and Lender could retain the considerable value in the Property to itself.

56. Lender intended to induce Silicon Hills to act upon the fraudulent representation. Silicon Hills actually and justifiably acted upon the representation and thereby suffered injury.

57. Additionally, the actions described above constitute fraud in a real estate transaction pursuant to Section 27.01(a) 1) and/or (2) of the Texas Business & Commerce Code, and Silicon Hills sues for recovery of damages pursuant thereto

### Equitable Subordination

58. Plaintiff incorporates by reference the factual allegations contained in the preceding paragraphs.

59. Defendant's inequitable conduct as described above has damaged Silicon Hills. Additionally, Defendant has enriched itself at the expense of Silicon Hills and its creditors. Pursuant to 11 U.S.C. §510(c) and/or Texas law, Defendant's liens and repayment of any debt should be equitably subordinated to repayment of other creditors in the bankruptcy case. Such subordination is not inconsistent with the Bankruptcy Code.

### Exemplary Damages

60. Defendant's conduct ,as described above, constitutes fraud, and/or was committed with malice, entitling Plaintiff to recovery of exemplary damages pursuant to Tex. Civ. Prac. & Rem. Code Ann. §41.003(a). Additionally and alternatively, Defendant's false representations, which were made with actual knowledge of the falsity, and/or Defendant benefitted therefrom, entitling Plaintiff to recover exemplary damages pursuant to Texas Bus. & Comm. Code §27.01(c) and/or (d).

### Attorneys' Fees

61. Plaintiff incorporates by reference the factual allegations contained in the preceding paragraphs.

62. Plaintiff requests recovery of its attorneys' fees pursuant to applicable law, including, but not limited to, Texas Civ. Prac. & Rem. Code §37.001 *et seq.*, §38.001 *et seq.*, and Texas Bus. & Comm. Code §27.01(e). Plaintiff is also entitled to recover its deposition costs, court costs and expert witness fees pursuant to Texas Bus. & Comm. Code §27.01(e).

WHEREFORE, PREMISES CONSIDERED, Silicon Hills prays that upon final hearing the Court enter judgment against Defendant for:

1. actual damages;

2. punitive and exemplary damages pursuant to Tex. Civ. Prac. & Rem. Code Ann. §41.003(a) and Tex. Bus. & Comm. Code § 27.01;

4831-3620-7033.1

3. subordination of Tuebor REIT's lien and claim to the claims of other creditors;

4. prejudgment and post judgment interest;

5. attorneys' fees; and

6. such other and further relief, at law or in equity, to which Plaintiff may be justly entitled.

Respectfully submitted,

WALLER LANSDEN DORTCH & DAVIS, LLP

By: */s/ Mark C. Taylor*
Eric J. Taube (Bar No. 19679350)
Morris D. Weiss (Bar No. 21110850)
Mark C. Taylor (Bar No. 19713225)
100 Congress Avenue, Suite 1800
Austin, Texas 78701
(512) 685-6400
(512) 685-6417 (FAX)
Email: Eric.Taube@wallerlaw.com
Morris.Weiss@wallerlaw.com
Mark.Taylor@wallerlaw.com

ATTORNEYS FOR PLAINTIFF