# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case No. 20-10042-tmd |
| | § | |
| SILICON HILLS CAMPUS, LLC, | § | |
| | § | Chapter 11 |
| DEBTOR. | § | |
| | § | |

| | | |
|---|---|---|
| SILICON HILLS CAMPUS, LLC | § | |
| | § | |
| Plaintiff | § | |
| | § | Adversary No. 20-01024-tmd |
| v. | § | |
| | § | |
| TUEBOR REIT SUB, LLC | § | |
| | § | |
| Defendant | | |

### TUEBOR REIT SUB LLC'S MOTION FOR SUMMARY JUDGMENT

Tuebor REIT Sub LLC ("**Lender**") moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure (the "**Federal Rules**"), made applicable by Rule 7056 of the Federal Rules of Bankruptcy Procedure, against Plaintiff Silicon Hills Campus, LLC ("**Debtor**"). In support of this Motion for Summary Judgment (the "**Motion**"), Lender respectfully states as follows:

### Preliminary Statement

Summary judgment should be granted in favor of Lender because there is no genuine issue of material fact that the maturity date was not extended past August 30, 2019, and there is no genuine issue of material fact that the Debtor defaulted under the Loan Documents. Together, these two facts are the linchpin basis of all four of the Debtor's causes of action and all associated requests for relief or remedies in the Plaintiff's Original Complaint (the

75772334.7

"**Complaint**"). Specifically, the Complaint (a) requests a declaratory judgment that (i) the loan did not mature on August 30, 2019, (ii) the Debtor is not in default under the Loan Documents, and, (iii) Lender does not have the right to foreclose on the property; (b) asserts claims for (i) breach of contract and (ii) fraud; and (c) requests equitable subordination, exemplary damages, and attorneys' fees in connection with the claims asserted.

This is a simple case involving the Debtor's default under the Loan Documents (as defined below) by failing to repay, in full, the indebtedness under the Loan Documents by the maturity date. Prior to the loan's original maturity date, the Debtor requested an extension, and thereafter Lender and the Debtor entered into multiple extensions with the loan maturity date finally being extended to and through 12:00 p.m., Central Time, on August 30, 2019. When the Loan matured, as a result of the Debtor's default under the Loan Documents, Lender sought to enforce its rights and remedies in state court.

Ultimately, the state court authorized Lender to proceed with foreclosure of the property. To thwart Lender's foreclosure efforts, the Debtor filed the bankruptcy case (the "**Bankruptcy Case**") in which the above-captioned adversary proceeding (the "**Adversary**") is pending. Once again, Lender was forced to incur legal expenses and take additional steps to foreclose on its collateral by filing its Amended Motion for Relief from the Automatic Stay [Docket No. 160] (the "**Stay Relief Motion**"), which this Court granted via oral ruling on November 24, 2020.

Because the crux of the entire Complaint hinges on the Debtor's factual assertion that the loan did not mature and no default occurred, summary judgment in favor of Lender is appropriate for three reasons. First, as set forth more fully below, in a contested matter between the Debtor and Lender in the above-captioned Bankruptcy Case, the Debtor admitted both that a maturity default occurred and that no payment was made after a good faith deposit that was made

75772334

on or about August 29, 2019, in connection with a maturity date extension request. These admissions were made through testimony of the Debtor's representative, Mr. Jeremy Stoler, and through Docket No. 174, Debtor's Response to Lender's Stay Relief Motion (the "**Stay Relief Response**"). Second, the undisputed facts in this Adversary, including assertions in the Debtor's own Complaint, demonstrate that the extension request never materialized into an enforceable contract. Third, the Court has already determined that Lender is entitled to proceed with enforcing its remedies under the Loan Documents, including moving forward with foreclosure.

Lastly, the Court should: (a) take judicial notice of (i) pleadings filed and evidence admitted, including the Loan Documents and written and oral testimony, in connection with and at the evidentiary hearings on the Stay Relief Motion that were conducted on November 6, 2020 and November 12, 2020 (collectively, the "**MSR Hearing**")[1] and (ii) the Court's prior rulings granting the Stay Relief Motion and denying Debtor's request for a stay pending appeal; and (b) grant this Motion and enter summary judgment in favor of Lender as to all counts in the Complaint, including denying any and all requests for damages or other remedies.

**Statement of Undisputed Facts[2]**

1. On or about February 6, 2018, Ladder Capital Finance LLC ("**Ladder**" or "**Original Lender**"), an affiliate of Lender, made a loan in the original principal amount of $64,000,000 (the "**Loan**") to the Debtor. (Compl. ¶ 5; Answer ¶ 5.)

2. In connection with the Loan, the Debtor executed and delivered to Original Lender that certain (a) that certain Loan Agreement, dated as of February 6, 2018, executed by

---

[1] Attached hereto is a true and correct copy of Robert M. Perelman's Declaration in Support of Tuebor REIT Sub LLC's Amended Motion for Relief from Automatic Stay ("**Perelman Declaration**"), Secured Lender's Exhibit X, which was submitted into evidence via Tuebor REIT Sub LLC's Amended Designation of Witnesses and Exhibits for November 6, 2020 Hearing [Docket No. 160] and admitted at the MSR Hearing.

[2] Lender incorporates by reference all factual allegations and assertions in the preceding paragraphs into the Statement of Undisputed Facts.

75772334

the Debtor (as borrower) and Original Lender (the "**Loan Agreement**"), (b) that certain Promissory Note, dated as of February 6, 2018, in the original principal amount of $64 million, executed by the Debtor and delivered to Original Lender (the **"Note"**), and (c) that certain Deed of Trust, Assignment of Leases and Rents, and Security Agreement, dated as of February 6, 2018 (the **"Deed of Trust"**). (Perelman Declaration, ¶ 6.) True and correct copies of the Loan Agreement, Note, and Deed of Trust are attached hereto as **Exhibit A**, **Exhibit B**, and **Exhibit C**, respectively. The Loan Agreement, Note, Deed of Trust, and all other documents further evidencing, securing, or executed in connection with the Loan, as the same have been modified from time to time, are sometimes referred to in this Motion collectively as the **"Loan Documents."**

3. On February 8, 2018, Original Lender assigned all of its right, title and interest in the Loan Documents to Lender, as evidenced by that certain Assignment of Deed of Trust by Original Lender to Lender, recorded on February 14, 2018 as Document No. 2018021704 in the Official Public Records of Travis County (the "**Assignment of Deed of Trust**"). (Stay Relief Response, ¶ 7; Perelman Declaration, ¶ 6.) As a result, Lender is the current holder and owner of the Loan and Loan Documents. (*Id.*) A true and correct copy of the Assignment of Deed of Trust is attached as **Exhibit D**.

4. The Loan's original maturity date was May 6, 2019 (the "**Original Maturity Date**"). (Compl. ¶ 7; Answer ¶ 7; Perelman Declaration, ¶ 11.)

5. Prior to the Original Maturity Date, the Debtor and Lender entered into the First Amendment to Loan Agreement, Guaranty of Recourse Obligations, and Other Loan Documents ("**First Amendment**"), dated May 4, 2019, and pursuant to the First Amendment, the maturity of

4

75772334

the Loan was initially extended to July 17, 2019 ("**First Extended Maturity Date**"). (Compl. ¶ 8; Answer ¶ 8.) A true and correct copy of the First Amendment is attached hereto as **Exhibit E**.

6. Prior to the First Amendment, the Debtor and Lender negotiated and exchanged correspondence and reached an agreement as to the terms, including payment required from the Debtor to execute the First Amendment. (Compl. ¶ 9; Answer ¶ 9.)

7. The Debtor and Lender entered into the Second Amendment to Loan Agreement and Other Documents ("**Second Amendment**") on July 15, 2019, and the Debtor and Lender negotiated and agreed on terms of the Second Amendment and that the Second Amendment extended the First Extended Maturity Date to August 16, 2019 ("**Second Extended Maturity Date**"). (Compl. ¶ 10; Answer ¶ 10.)

8. The Second Amendment contained an option for Debtor to further extend the Second Extended Maturity Date to August 30, 2019, provided that the Debtor perform certain conditions, including making a payment of approximately $505,000.00 prior to August 15, 2019. (Compl. ¶ 11; Answer ¶ 11.) Per the Second Amendment, extending the First Extended Maturity Date to the Second Extended Maturity Date also required the Debtor to make payments totaling in excess of $1,655,000.00. (*Id.*) Lender and the Debtor had fully negotiated all of the terms of the Second Amendment prior to its execution. (*Id.*)

9. Prior to the August 30, 2019 extended maturity date (the "**Maturity Date**"), the parties once again began negotiation for an extension of the Maturity Date to December 2019 (the "**Proposed Third Amendment**"). (Compl. ¶ 12; Answer ¶ 12.) During these negotiations, the parties exchanged various terms and requirements. (*Id.*)

75772334

10. On or about August 21, 2019, Lender and the Debtor began discussion of the extension of terms to extend the Maturity Date (August 30, 2019) to December 2019. (Compl. ¶ 13; Answer ¶ 13.)

11. Robert Perelman ("**Perelman**") sent an email on behalf of Lender to the Debtor on August 22, 2019 proposing 18 terms that would need to be agreed to and accomplished prior to August 30, 2019. (Compl. ¶ 14; Answer ¶ 14.) These terms included, without limitation, (i) a payment of $500,000.00 "good faith" deposit by Debtor with Lender (the "**Deposit**"); (ii) Debtor's payment of a $1,000,000.00 principal pay-down plus a $10,000.00 exit fee; (iii) Debtor's payment of $151,250.00 as an extension fee; (iv) Debtor's payment of $716,667.00 for real estate taxes; (v) Debtor's payment of $1,387,824.00 for debt service; (vi) evidence of insurance coverage and fully paid premiums for twelve months; and (vii) an amount to be determined for common area maintenance. (*Id.*)

12. On August 23, 2019, Perelman sent the Debtor an e-mail requesting the Deposit to be provided pursuant to the accompanying wire instructions. (Compl. ¶ 16; Answer ¶ 16.) Perelman stated that a draft agreement had been prepared and would be sent for the Debtor's review and comment. (*Id.*)

13. On August 27, 2019, the Debtor sent Lender an e-mail with attached agreements for the operations and management of the Property and power plant. (Compl. ¶ 17; Answer ¶ 17.)

14. On August 29, 2019, Lender sent the Debtor an e-mail stating that the Deposit had been received and provided a funding sheet setting forth remaining amounts of money that the Debtor had to provide to Lender to secure the Proposed Third Amendment. (Compl. ¶ 18; Answer ¶ 18.) This funding sheet set forth that the Debtor would be required to send Lender

$2,592,954.00 (the "**Initial Funding Requirement**") for various purposes, including loan pay-down, taxes, debt service, and extension fee, among other items. (*Id.*)

15. On August 29, 2019, at around 7:10 p.m., Lender's counsel sent the Debtor a revised draft of the Proposed Third Amendment and an updated funding statement in the amount of $3,217,153.00 (the "**Final Funding Requirement**"). (Compl. ¶ 19; Answer ¶ 19.)

16. On August 29, 2019, at around 9:48 p.m., Lender informed the Debtor that Lender would hold its signatures to the Proposed Third Amendment in escrow. (Compl. ¶ 20; Answer ¶ 20.)

17. On August 30, 2019, at around 5:55 a.m., Lender sent the Debtor an email acknowledging its receipt of the fully executed extension documents by the Debtor and demanded the payment of the Final Funding Requirement. (Compl. ¶ 21; Answer ¶ 21.)

18. On August 30, 2019, at around 8:55 a.m., the Debtor informed Lender that it expected to have small edits to the escrow requirement numbers submitted shortly. (Compl. ¶ 22; Answer ¶ 22.) Around 9:28 a.m., the Debtor submitted to Lender a revised version of the funding statement disputing several of the amended figures and offering to pay $2,527,739.00 (the "**Counteroffer to Final Funding Requirement**"). (*Id.*)

19. As stated above, the following summarizes the funding requirement negotiations between Lender and the Debtor with respect to the Proposed Third Amendment:

   a. Lender initially proposed the Initial Funding Requirement in the amount of $2,592,954.00. (Compl. ¶ 18; Answer ¶ 18.)

   b. On the evening of August 29, 2019, the day before the Loan was set to mature, Lender communicated the Final Funding Requirement, which was $3,217,153.00 (Compl. ¶ 19; Answer ¶ 19.)

   c. On August 30, 2019, the Debtor sent Lender a revised version of the funding statement with the Counteroffer to the Final Funding Requirement, which was $2,527,739.00. (Compl. ¶ 22; Answer ¶ 22.)

20. Lender demanded fully and final payment of the Loan on August 30, 2019 and retained the $500,000 deposit given by the Debtor. (Compl. ¶ 23; Answer ¶ 23.)

21. Lender negotiated and exchanged correspondence with the Debtor prior to the Maturity Date. (Compl. ¶ 24; Answer ¶ 24.)

22. In connection with the Proposed Third Amendment, the only payment that the Debtor made to Lender was the Deposit. (Nov. 6 Hr'g. Tr. 43:10-13; Nov. 12 Hr'g. Tr. 6:22-25.)

23. The Debtor has not made a single payment to Lender since the Deposit that was made in August 2019. (*Id.*)

24. Debtor defaulted under the Loan Documents (Perelman Declaration, ¶ 23; Nov. 12 Hr'g. Tr. 7:10-12; Stay Relief Response, ¶ 10.). In particular, the Debtor default on August 30, 2019 when it failed to make a payment in the full and total amount of indebtedness, which was no less than $61,500,000, exclusive of interest, fees, and other costs, that was due and owing under the Loan Documents on August 30, 2019. (Perelman Declaration, ¶ 23; Nov. 6 Hr'g. Tr. 16:14-16, 21-24; 36:17-25; Nov. 12 Hr'g. Tr. 7:10-12.)

25. Lender moved for the appointment of a receiver in *Tuebor REIT Sub, LLC v. Silicon Hills Campus, LLC*, Case No. D-1-GN-19-005215, filed in the 53rd Judicial District in the District Court of Travis County, Texas (the "**State Court Action**"). (Compl. ¶ 26; Perelman Declaration, ¶ 24.) A true and correct copy of the motion requesting the appointment of a receiver is attached hereto as **Exhibit F**.

26. Lender posted the Property for a non-judicial foreclosure sale for October 1, 2019. (Compl. ¶ 27; Answer ¶ 27; Perelman Declaration, ¶ 25.) A true and correct copy of the notice of foreclosure sale is attached hereto as **Exhibit G.**

75772334

27. Thereafter, Lender rescheduled and posted the Property for a non-judicial foreclosure sale twice, with the ultimate sale date being January 7, 2020. (Perelman Declaration, ¶29.) True and correct copies of the second and third notices of foreclosure sale are attached hereto as **Exhibit H** and **Exhibit I**, respectively.

28. Debtor filed the Bankruptcy Case just hours before the non-judicial foreclosure sale was scheduled to commence on January 7, 2020. (Stay Relief Response, ¶¶ 2, 20.) On October 2, 2020, Lender filed its Stay Relief Motion [Docket No. 160].

29. The Debtor, through its Stay Relief Response, admitted the following:

> *As a result of Debtor's default under the Loan Documents*, and in conjunction with the exercise of is remedies, Secured Lender scheduled a non-judicial foreclosure sale for October 1, 2019 and requested the appointment of the Receiver in *Tuebor REIT Sub, LLC v. Sillicon Hills Campus, LLC*, Case No. D-1-GN-19-005215, filed in the 53rd Judicial District in the District Court of Travis County, Texas (the "**Response Admission**") (Stay Relief Response, ¶10.)

30. The Debtor, through testimony of its representative, Mr. Jeremy Stoler, at the MSR Hearing, made the following admission when asked "would you agree that an event of default has occurred under the loan documents": "There was a maturity default, yes." (the "**Testimony Admission**" and, together with the Response Admissions, the "**Default Admissions**") (Nov. 12 Hr'g. Tr. 7:13-16.)

31. Upon consideration of the Stay Relief Motion, the Stay Relief Response, all evidence admitted in connection with and throughout the MSR Hearing, and arguments of counsel, on November 24, 2020, the Court entered its Order Granting Lender's Motion for Relief from Stay [Docket No. 230]. That same date, the Court delivered its oral ruling (the "**Ruling**") on the Stay Relief Motion, stating, among other things, that "[a]n order will be entered

modifying the stay to allow the lender to exercise its rights under State law and to allow the state court receivership for pleadings to continue." (Nov. 24 Hr'g. Tr. 11:9-11.)

32. On December 7, 2020, the Debtor filed a Notice of Appeal, and on December 11, 2020, the Debtor filed its Emergency Motion for Stay Pending Appeal, which this Court denied on December 23, 2020. *See Order Denying Debtor's Emergency Motion for Stay Pending Appeal* [Docket No. 269].

## Argument

*A. The Court Should Take Judicial Notice Pursuant to FRE 201.*

The Court should take judicial notice of (a) the Debtor's admissions, whether written or oral, made in its pleadings, including the Stay Relief Response (Docket No. 174), and testimony at the MSR Hearing; (b) pleadings filed in the Bankruptcy Case in connection with the Stay Relief Motion, including the Robert Perelman's Declaration in Support of Tuebor REIT Sub LLC Amended Motion for Relief from Automatic Stay (the "**Perelman Declaration**") (MSR Hearing. Secured Lender's Ex. X); and (c) this Court's own oral rulings on the Stay Relief Motion dated November 24, 2020 and on Debtor's request for a stay pending appeal dated December 23, 2020 and any other pleadings that the Court relied on in adjudication of the facts relevant to the Stay Relief Motion.[3]

Federal Rule of Evidence 201 permits courts to take judicial notice of "adjudicative facts." *See* FED. R. EVID. 201(a). In other words, "when a court or an agency finds facts concerning the immediate parties, including who did what, where, when, how, and with what motive or intent, the court or agency is performing an adjudicative function, and the facts are called 'adjudicative facts.'" *O'Quinn v. Hall*, 77 S.W.3d 438, 447 (Tex. App.—Corpus Christi

---

[3] Out of an abundance of caution and for the convenience of the Court, Lender attaches copies of the Stay Relief Response and Perelman Declaration hereto as **Exhibit J** and **Exhibit K** respectively.

75772334

2002) (citation omitted). Additionally, a court may take judicial notice in the context of a motion for summary judgment pursuant to Federal Rule 56. *See* FED. R. EVID. 201(d) ("The court may take judicial notice at any stage of the proceeding."); *see also Clarke v. Allianz Global Risks U.S. Ins. Co.,* 639 F. Supp. 2d 751, 753 n. 2 (N.D. Tex. 2009) (taking judicial notice of documents upon request of respondent to motion for summary judgment).

A court may take judicial notice of public records, including transcripts, if their content goes to an issue that is relevant to the motion before the court. *See Funk v. Stryker Corp.*, 631 F.3d 777, 780 (5th Cir. 2011) (finding the district court took appropriate judicial notice of publicly-available documents and transcripts directly relevant to the issue underlying the Rule 12(b)(6) motion to dismiss); *see also In re BFN Operations LLC*, 607 B.R. 551, 558 (Bankr. N.D. Tex. 2018) (taking judicial notice of filings in underlying bankruptcy case to conclude reasonableness of trustee's reliance on certain information contained in those documents). Indeed, courts may even take judicial notice of parties' positions in other actions. *See, e.g., In re Emas Chiyoda Subsea Limited*, 2020 WL 1696105, *2 (Bankr. S.D. Tex. April 6, 2020) (taking judicial notice of claims and/or admissions made in initial response); *In re DeRose Grund*, 544 B.R. 339, 355 n. 14 (Bankr. S.D. Tex. 2016) (reviewing complaints filed in other lawsuits to support findings of fact because "[c]ourt documents from another case may be used to show that the document was filed, that [a] party took a certain position, and that certain . . . allegations or admissions were made . . .") (citation omitted).

Courts may also take judicial notice not only of their own judgments, but "[c]ourts may take judicial notice of findings entered in other cases where there is a common connection between some material elements of those cases." *See, e.g., In re Bradley*, 495 B.R. 747, 774 n. 15 (Bankr. S.D. Tex. 2013) (in the context of a show cause and disgorgement motion the court

11

took judicial notice of findings of another court because the "common connection [was] the Firm and any sanctions imposed against it."); *see also In re Wyly*, 553 B.R. 318, 322-23 (Bankr. N.D. Tex. 2016) (courts may take judicial notice of their own judgments); *In re TXCO Res., Inc.*, Case No. 09–51807 [Docket No. 1204] (Bankr. W.D. Tex. Jan. 27, 2010) (taking judicial notice of all "pleadings and other documents filed with, *all orders entered* by, and all evidence and arguments made, proffered or adduced at the hearings held before the [c]ourt during the pendency of the chapter 11 cases") (emphasis added).

> B. *The Court Should Grant Summary Judgment for Lender as to Each Count of the Complaint, including the Request for Remedies.*

Summary judgment should be entered as to the entirety of the Complaint. Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Belanger v. BAC Home Loans Servicing, L.P.*, 839 F. Supp. 2d 873, 875 (W.D. Tex. 2011) (stating that summary judgment is appropriate "when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law"). Once the movant meets its initial burden to show the absence of a dispute of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). In the Fifth Circuit, "[t]his burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Id.* (internal citations and quotations omitted). This Court has observed that, "[t]o survive a motion for summary judgment, the proffered fact issues must be material and subject to a genuine dispute. Material facts are those that have the potential to affect the outcome under the governing law." *Belanger*, 839 F. Supp. 2d at 876. Disputes over irrelevant or unnecessary facts are disregarded. *Id.*

12

*1. Declaratory Judgment*

The Debtor requests declaratory relief that there was no default under the Loan Documents because there was a binding and enforceable agreement to extend the Maturity Date. (*See* Compl. ¶ 43.). This declaratory judgment claim is based ***entirely*** on the Debtor's contention that there was no default under the Loan Documents. The Court should grant summary judgment as to the Declaratory Judgment cause of action, because there is no genuine issue of fact that the Debtor defaulted under the Loan Documents.

Default Admissions

In the Stay Relief Response, the Debtor admits, without qualification, the allegations in paragraph 10 of the Stay Relief Motion, which includes the occurrence of "Debtor's default under the Loan Documents." (Statement of Undisputed Facts "**SOF**", ¶ 29.) Additionally, at the second day of the MSR Hearing, Debtor's representative Mr. Jeremy Stoler testified that an "event of default" and in particular a "maturity default" occurred under the Loan Documents. (SOF, ¶ 30.) The Default Admissions undermine the entirety of the Complaint and wholly guts the Debtor's Declaratory Judgment cause of action. Based on the Default Admissions alone, summary judgment should be granted in Lender's favor on the Declaratory Judgment cause of action.

Admission of Failure to Make Required Payments

In addition to the Default Admissions, the Debtor admits it made no payment to Lender since it made the Deposit payment in August 2019 ***before*** the Loan's Maturity Date. (SOF, ¶¶ 22-23.) The Deposit was not a regularly-scheduled debt service payment on the Note, but instead it was a good faith deposit made in exchange for the right to negotiate a potential extension of

13

the Loan's Maturity Date. (SOF, ¶¶ 10-13, 14.) There can be no dispute that if no payments have been made on the Loan since the Deposit was made, there is undeniably a default.

<u>The Complaint Demonstrates No Meeting of the Minds</u>

Similarly, the Court should grant summary judgment as to the Declaratory Judgment cause of action, because there is no genuine issue of fact that there was no binding and enforceable agreement to extend the Maturity Date. In at least two paragraphs of the Complaint, the Debtor's own allegations demonstrate there was no meeting of the minds with respect to the Proposed Third Extension. First, the Debtor states,

> During these negotiations, the parties exchanged various terms and requirements which resulted, *as far as Silicon Hills was concerned*, [sic] an agreement that Silicon Hills would be required to meet certain requirements prior to August 30, 2019, and conditioned on performing these requirements, Lender agreed to an extension until December 2019.

(Compl. ¶ 12.) Second, the Debtor admits in paragraphs 18, 19, and 22 of the Complaint that the Debtor rejected and countered Lender's Initial Funding Requirement and Final Funding Requirement offers. (SOF, ¶¶ 14-15, 18-19). In fact, in paragraph 22 of the Complaint, the Debtor states, "At 9:28 a.m., Silicon Hills submitted to Lender *a revised version* of the "funding statement' *disputing* several of the amended figures and offering to *pay $2,527,739.00, a number substantially similar* to that previously agreed to by the Parties." (Compl. ¶ 22.) Thus, the Debtor admits it is disputing and counteroffering Lender's Final Funding Requirement offer – a counteroffer definitively proves there is no meeting of the minds. The Debtor also states that its offer ($2,527,739.00) is "substantially similar" to the Initial Funding Requirement ($2,592,954.00) – but "substantially similar" is not the same as equal. As plainly set forth in the Complaint, the Counteroffer to Final Funding Requirement was $65,215 less than the Initial

14

Funding Requirement Offer. Still, the Debtor asserts that the Proposed Third Amendment formed an "enforceable contract." (Compl. ¶ 43.)

In light of the Default Admissions, Nonpayment Admission, and the allegations in the Complaint, as described above, there can be no genuine issue of fact as to whether a meeting of the minds – let alone an enforceable contract – existed. The Proposed Third Amendment was just that – a proposed amendment that never materialized into a contract.

Lastly, the Court has already ruled that Lender is entitled to pursue its rights and remedies under the Loan Documents, including foreclosure, notwithstanding the Bankruptcy Case filing or the appeal. (SOF, ¶¶ 31, 32.) Therefore, the indisputable and adjudicated fact is that the Court has already determined the Debtor is not entitled to the declaratory relief it seeks and that the Debtor is unlikely to succeed on the merits of its appeal. Accordingly, summary judgment should be granted in favor of Lender.

2.  *Breach of Contract*

"Under Texas law, a breach of contract claim has four elements: (1) ***the existence of a valid contract***; (2) that the party performed or tendered performance; (3) that the other party breached the contract; and (4) that the party was damaged as a result of the breach." *City of Dallas v. Delta Air Lines, Inc.*, 847 F.3d 279, 287 (5th Cir. 2017) (emphasis added). "To prevail on a claim for breach of contract, the contract must be enforceable." *In re Harris*, 2011 WL 2708691, at *4 (Bankr. S.D. Tex. July 11, 2011) (purported forbearance agreement would not be enforceable unless it was in writing and signed by the party to be charged).

Like the Debtor's Declaratory Judgment cause of action, the breach of contract cause of action hinges on the Debtor's factual assertion that no default occurred. The Debtor's "no default" position is premised on the Debtor's allegation that the Proposed Third Amendment

15

became a binding and enforceable contract between Lender and Debtor, thereby extending the Maturity Date to December 2019. (Compl. ¶ 43.) Summary judgment should be granted in favor of Lender for all of the reasons set forth above in response to Debtor's Declaratory Judgment action. Accordingly, Lender incorporates by reference herein all paragraphs set forth above in Section B.1 of this Argument section of the Motion.

      3.      *Fraud*

The Debtor bases this claim on its allegation that the loan was not in default and, therefore, Lender's default notice was erroneous and that Lender "recklessly asserted the representation of default without knowledge of its truth." (Compl. ¶ 51.) Because of the Default Admissions and the admission to failing to make a payment after the Deposit, there is no genuine issue of fact as to whether the Debtor defaulted under the Loan Documents. (SOF, ¶¶ 23, 29-30.) Further, there can be no genuine issue of fact as to whether Lender had actual knowledge of the default, especially since Lender demanded payment in full and proceeded to enforce its rights in state court. (SOF, ¶¶ 18-19.)

Because the Debtor's fraud cause of action, like its Declaratory Judgment and breach of contract causes of action, hinge on whether the Debtor defaulted under the Loan Documents, Lender incorporates by reference herein all paragraphs set forth above in Section B.1 of the Argument section of this Motion. For these reasons, summary judgment should be granted in favor of Lender.

      4.      *Equitable Subordination, Exemplary Damages, Attorneys' Fees*

There is no genuine dispute as to any material fact with respect to the Debtor's request for the remedies of equitable subordination, exemplary damages, and attorneys' fees. All of the requested remedies are premised on allegations of equitable wrongdoing on the part of Lender

that are all based on the factual assertion that the Loan did not mature on August 30, 2019. Because the indisputable and adjudicated fact is that the Debtor defaulted under the Loan Documents, the Debtor's request for all remedies should be denied. Lender incorporates by reference herein all paragraphs set forth above in Section B.1 of this Argument of the Motion.

      i.    Equitable Subordination

Equitable subordination is a remedy that is "not available absent a finding that the party with a superior lien or claim engaged in false or inequitable conduct that conferred an unfair advantage on itself or injured third parties." *See World Help v. Leisure Lifestyles, Inc.*, 977 S.W.2d 662, 683 (Tex. App. –Forth Worth 1998, pet denied) (citation omitted). *see also In re Herby's Foods, Inc.*, 2 F.3d 128, 130 (5th Cir. 1993). For the reasons set forth above, including, without limitation, the Ruling and this Court's Order Denying Debtor's Emergency Motion for Stay Pending Appeal, there is no genuine issue of material fact that is relevant to Debtor's request for equitable subordination. Thus, the Debtor's request for equitable subordination should be denied.

      ii.    Exemplary Damages

The undisputed facts demonstrate the Debtor is not entitled to exemplary damages under Section 41.003(a) of the Texas Civil Practice & Remedies Code or Section 27.01 of the Texas Business & Commerce Code. First, exemplary damages are designed to penalize a defendant for outrageous, malicious, or otherwise morally culpable conduct and to deter such conduct in the future. *See Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 230 (Tex. 2019). Second, section 41.003(a) of the Texas Civil Practice & Remedies Code provides that exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm" was the result of fraud, malice or gross negligence. Tex. Civ. Prac. &

75772334

Rem. Code § 41.003(a). Third, section 27.01 of the Texas Business & Commerce Code (a) does not apply to the facts here and, even if it did, (b) permits exemplary damages to be awarded for "fraud." *See* Tex. Bus. & Com. Code § 27.01 (to recover plaintiff must establish (1) a false representation of a past or existing material fact, that is made to a person for the purpose of inducing that person to enter a contract and is relied on by that person in entering into that contract; or (2) a false promise to do an act where the promise is material, made with the intention of not fulfilling it, to a person for the purpose of inducing them to enter into a contract, and relied on by the person entering the contract); *Burleson State Bank v. Plunkett*, 27 S.W.3d 605, 611 (Tex. App.—Waco 2000, pet. denied) ("Section 27.01 only applies to misrepresentations of material fact made to induce another to enter into a contract for the sale of land or stock. A loan transaction, even if secured by land, is not considered to come under the statute.").

For the reasons set forth above, including, without limitation, Lender's response to the Debtor's fraud claim, there is no genuine dispute as to whether Lender acted with fraud, malice, or gross negligence by enforcing its rights and remedies under the Loan Documents. Thus, the Debtor's request for exemplary damages should be denied and summary judgment should be granted to Lender.

### iii. Attorneys' Fees

The undisputed facts demonstrate the Debtor is not entitled to attorneys' fees under section 38.001 of the Texas Civil Practice & Remedies Code or section 27.01(e) of the Texas Business & Commerce Code. For all of the reasons set forth above, the Debtor's request for attorneys' fees should be denied.

## **CONCLUSION**

There are no material facts in dispute here. In light of the Default Admissions, the admission of non-payment, the Ruling, and the Order Denying Debtor's Emergency Motion for Stay Pending Appeal, there can be no genuine dispute regarding whether the Debtor defaulted under the Loan Documents. Based on these undisputed and adjudicated facts, Lender is entitled to judgment in its favor as a matter of law with respect to the entirety of the Complaint.

WHEREFORE, Lender respectfully requests that this Court enter an order granting: (i)°summary judgment in Lender's favor as to entirety of the Complaint; and (ii) grant Lender any other relief this Court deems just and proper.

    Respectfully submitted,

    POLSINELLI PC

    */s/ Liz Boydston*
    Liz Boydston (SBN 24053684)
    Savanna Barlow (SBN 24109617)
    Trinitee G. Green (SBN 24081320)
    POLSINELLI
    2950 N. Harwood Street, Suite 2100
    Dallas, Texas 75201
    Telephone: (214) 397-0030
    lboydston@polsinelli.com
    sbarlow@polsinelli.com
    tggreen@polsinelli.com

    *Counsel for Tuebor REIT Sub LLC*

75772334

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she caused a true and correct copy of the foregoing document to be electronically filed with the Court and served through the CM-ECF system to all counsel of record registered to receive a Notice of Electronic Filing for this case. A copy of the foregoing was served via electronic mail on Debtor, Debtor's representatives, Debtor's counsel, and the US Trustee, as follows on January 5, 2021:

| | |
|---|---|
| DEBTOR<br>Silicon Hills Campus, LLC<br>814 Lavaca St.<br>Austin, Texas 78701<br><br>c/o World Class Capital Group, LLC,<br>767 Fifth Avenue, 16th Floor<br>New York, New York, 10153<br>Attention: Legal Department<br>npaul@wccapitalgroup.com | DEBTOR'S COUNSEL<br>Waller Lansden Dortch & Davis, LLP<br>Morris D. Weiss<br>Mark C. Taylor<br>Eric Taube<br>Trip Nix<br>100 Congress Avenue, Suite 1800<br>Austin, Texas 78701<br>morris.weiss@wallerlaw.com<br>mark.taylor@wallerlaw.com<br>eric.taube@wallerlaw.com<br>trip.nix@wallerlaw.com |
| UNITED STATES TRUSTEE<br>Henry G. Hobbs, Jr.<br>903 San Jacinto Blvd, Room 230<br>Austin, Texas 78701<br>ustpregion07.au.ecf@usdoj.gov | |

*/s/ Liz Boydston*
Liz Boydston

75772334